Rodney **BERRY**, Plaintiff–Appellant,

v.

Leroy **BACA**, Defendant–Appellee.

R.D. Mortimer, Plaintiff–Appellant,

v.

Leroy Baca, Defendant–Appellee.

Anthony K. Hart, Plaintiff–Appellant,

v.

Leroy Baca, Defendant–Appellee.

Nos. 03–56000, 03–56004, 03–56096.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 9, 2004.

Filed Aug. 13, 2004.

---

Stephen Yagman, Marion R. Yagman, Yagman & Yagman & Reichmann, Venice Beach, CA, for the plaintiffs-appellants.

Michael D. Allen, Franscell, Strickland, Roberts & Lawrence, Glendale, CA, for the defendant-appellee.

Before D.W. NELSON, JOHN R. GIBSON,* and GRABER, Circuit Judges.

## OPINION

D.W. NELSON, Senior Circuit Judge:

Anthony Hart, Rodney Berry, and Roger Mortimer each sue Los Angeles County Sheriff Leroy Baca, in his official capacity, for pursuing a policy of deliberate indifference to their constitutional rights that resulted in unlawful periods of over-detention in the Los Angeles County jail. In each case, the plaintiff was detained for a period ranging from twenty-six to twenty-nine hours after the court had authorized his release from jail. Their cases were consolidated before the district court.

On May 29, 2003, the district court granted Baca's motion for summary judgment. The court based its holding on the recently decided Ninth Circuit case, *Brass v. County of Los Angeles*, 328 F.3d 1192 (9th Cir.), *cert. denied*, — U.S. —, 124 S.Ct. 925, 157 L.Ed.2d 744 (2003), which the district court held controlled because it found *Brass* and these consolidated cases "rest upon nearly identical grounds."

Because we conclude that *Brass* is distinguishable, and that the plaintiffs in this case have raised a genuine issue of material fact with regard to the existence of a county policy of deliberate indifference to the constitutional rights of the plaintiffs, we reverse the grant of summary judgment and remand to the district court for further proceedings.

## I. Factual and Procedural History

### A. Anthony Hart

Anthony Hart was arrested on August 14, 2000, for felony charges of grand theft. On August 17, 2000, the Superior Court ordered his release from jail. At the same time, the court also ordered him to appear at 9:30 a.m. that day in a different department on the same charge. Hart was released from custody on August 18 at 2:02 p.m. This was twenty-nine hours and thirty-two minutes after the court authorized his release.

The paperwork from the Superior Court authorizing Hart's release did not arrive at the Inmate Reception Center ("IRC") of the Los Angeles County jail until the end of the day on August 17, and because the release form had an order to appear in a different department, personnel at IRC waited until the following morning to confirm with the court that Hart was to be released. Once the release was confirmed, it was entered into the Automated Justice Information System ("AJIS"), the computer system for booking, tracking, and release of inmates. It took five hours and twenty-five minutes from the time his release was entered into the AJIS until Hart's release.

### B. Rodney Berry

Rodney Berry was arrested on a drug charge on October 5, 1999. After a jury trial resulted in a deadlocked jury and several further amended charges and pleas, the Superior Court ordered the charges dropped and authorized Berry's release on February 1, 2001, at 11:30 a.m. On February 2, 2001, at 2:02 p.m., Berry was released from jail. This was twenty-six hours and thirty-two minutes after the Superior Court's order for his release, and sixteen and a half hours after his release order was entered into the AJIS.

### C. Roger Mortimer

Roger Mortimer was arrested for charges of rape with a foreign object on

---

* The Honorable John R. Gibson, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

April 1, 2000. On August 14, 2000, the jury announced a verdict of not guilty. That same morning, at 11:45 a.m., the Superior Court authorized Mortimer's release. Mortimer was released on August 15, 2000, at 4:57 p.m. This was twenty-nine hours and twelve minutes after the order for his release and seventeen hours after his release order was entered into the AJIS.

## D. *Procedural History*

After their releases, Hart, Berry, and Mortimer each filed suit in the Central District of California, on February 27, 2001, March 1, 2001, and December 12, 2000, respectively. Each plaintiff alleged that his constitutional rights were violated by the hours spent in detention after his court-authorized release from jail. The three cases were consolidated before District Court Judge Dean Pregerson. On September 16, 2002, Defendant/Appellee Sheriff Leroy Baca filed a motion for summary judgment, which the district court granted on May 29, 2003. Each plaintiff timely appealed.

## II. *Discussion*

■ The plaintiffs sued Los Angeles County Sheriff LeRoy Baca, in his official capacity, pursuant to 42 U.S.C. § 1983, for violating their Fourth and Fourteenth Amendment rights. County officials can be held liable under § 1983 if they act as "lawmakers or ... those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Baca does not dispute that he acted on behalf of the official policy of Los Angeles County (hereinafter "the County").

■ In order to hold Baca liable under § 1983, plaintiffs must demonstrate that " 'action pursuant to official municipal policy of some nature caused a constitutional tort.' " *Brass*, 328 F.3d at 1198 (quoting *Monell*, 436 U.S. at 691, 98 S.Ct. 2018). We have stated that "a local governmental body may be liable if it has a policy of inaction and such inaction amounts to a failure to protect constitutional rights." *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir.1992) (citing *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). However, the policy of inaction must be more than mere negligence, *see Daniels v. Williams*, 474 U.S. 327, 333–36, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); it must be a conscious or deliberate choice among various alternatives. *See Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir.2001).

■ In order to impose liability based on a policy of deliberate inaction, the "plaintiff must establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy [was] the 'moving force behind the constitutional violation.' " *Oviatt*, 954 F.2d at 1474 (quoting *City of Canton*, 489 U.S. at 389–91, 109 S.Ct. 1197).

The district court did not discuss this four-step showing, because it did not address the plaintiffs' claims that the County's policies amount to a policy of deliberate indifference to their constitutional rights. Instead, the district court found that it "is bound by the holding in *Brass* and finds that the County's challenged policies did not result in a violation of the plaintiffs' constitutional rights."

## A. Brass *is Distinguishable*

■ While *Brass* is closely related to the cases at hand, it does not directly control this case. In *Brass,* the plaintiff— also a detainee in a Los Angeles County

jail—was held for thirty-nine hours after the court ordered his release. 328 F.3d at 1194. Brass's primary claim focused on the County's policy of releasing prisoners pursuant to court order only after the completion of processing all inmates scheduled for release on that day. *Id.* at 1198. He also challenged the County's practice of beginning the processing of releases only after all information relating to prisoners scheduled for release on a particular day had been received and entered into the computer system. *Id.*

The *Brass* panel affirmed the district court's grant of summary judgment to the County. The panel acknowledged that over-detention after court-ordered release has the potential to violate constitutional rights. *See id.* at 1200 ("Brass may have had a due process right to be released within a reasonable time after the reason for his detention ended."). The panel found, however, that the contested policies could not have caused the deprivation of constitutional rights. As to the first policy, the panel held that "Brass did not have a constitutional right to have his release papers processed in any particular order . . . ." *Id.* As to the second policy, the panel held,

> To the extent Brass's claim rests on the County's policy or custom of not starting to process a particular day's releases until it has received all information, including wants and holds, relating to the prisoners scheduled for release, we cannot say the County thereby violated Brass's constitutional rights. To the contrary, we think that that aspect of the County's release program was justified and reasonable in light of the County's problems and responsibilities in processing the large number of prisoner releases it handles.

*Id.* at 1201.

Here, in contrast to *Brass,* the plaintiffs do not limit their challenge to the County's specific policies. Rather, as argued in their briefs to this Court, they challenge the policy "*in toto* . . . that simply delays all releases until the system, in its sweet time, and with the resources it chooses . . . is ready to make releases." Stated another way, the plaintiffs in this case challenge the implementation of the County's policies, rather than the specific policies themselves. They claim that the County's unreasonably inefficient implementation of its administrative policies amounts to a policy of deliberate indifference to their constitutional rights.

■ While on first glance this may appear a subtle difference, in fact there is a crucial distinction between the challenge to specific policies in *Brass* and the challenge to the implementation of the policy "in toto" in this case. It cannot be the case that, if the County's system of administratively processing releases took several days or weeks to complete, its policy could not be challenged as one of "deliberate indifference" simply because each of the administrative procedures employed is theoretically reasonable. As a matter of law, the County's system of administrative processing cannot be immune from allegations that, in practice, it amounts to a policy of deliberate indifference. *Brass* did not raise this type of challenge, because Brass focused his challenge upon the County's release policies themselves. Tellingly, nowhere in the *Brass* opinion does the panel discuss the "deliberate indifference" line of *Monell* cases, because this was not the claim at issue. Here, in contrast, deliberate indifference is precisely the claim at issue.

We find the analysis in this case to be more closely related to *Oviatt* than to *Brass.* In *Oviatt,* the plaintiff was held without arraignment for 114 days, and

sued the county on the theory that its policy regarding missed arraignments constituted a policy of deliberate indifference to the inmates' constitutional rights. The *Oviatt* panel agreed, holding that there was "no question that the decision not to take any action to alleviate the problem of detecting missed arraignments constitutes a policy for purposes of § 1983 municipal liability." 954 F.2d at 1477. The panel went on, "The need for different procedures was so obvious that [the county official's] adamant refusal to take action amounted to deliberate indifference to the detainees' constitutional rights." *Id.* at 1478. Accordingly, the panel affirmed the district court's denial of the county's motion for judgment notwithstanding the verdict, and upheld the jury's verdict for the plaintiff. *Id.* at 1480.

Here, we are faced with 29 hours of over-detention rather than 114 days. In addition, the County has offered more substantial justifications for its delay than in *Oviatt*, arguing that the delays are the reasonable result of necessary administrative procedures. These are issues of fact, however, not matters of law. As discussed below, these considerations will factor heavily into the jury's determination of whether the County's policies are reasonable. However, at the summary judgment stage, *Oviatt's* framework applies. This analysis differs from *Brass* because it is not limited to the affirmative policies of the County, but rather, considers the existence of a policy of deliberate inaction underlying the current policies' implementation.

B. *The Role of the Judge at Summary Judgment*

 There is an additional, related basis for concluding that *Brass* is distinguishable. It is difficult to square the district court's interpretation of *Brass* with the appropriate role of the judge at summary judgment. The Supreme Court has warned that at summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In the context of *Monell* claims of deliberate indifference, we have held that, "Whether a local government has displayed a policy of deliberate indifference to the constitutional rights of its citizens is generally a jury question." *Gibson v. County of Washoe,* 290 F.3d 1175, 1194–95 (9th Cir.2002).

In *Blair v. City of Pomona,* 223 F.3d 1074 (9th Cir.2000), the plaintiff alleged a policy of deliberate indifference to the retaliation against whistleblowers by members of the police department. The panel reversed the district court's grant of summary judgment to the police department, holding that material facts were in dispute as to the department's custom of chastising and harassing whistleblowers. *Id.* at 1080–81. The panel stated, "The City asserts explanations and defenses, but they depend on disputed facts and inferences, proper for a jury to consider but not effective to sustain summary judgment." *Id.* at 1080.

Similarly, in the instant case, the County provides explanations and defenses to justify the delays in releases. The County submitted declarations from various county employees describing the administrative processing system and explaining why it reasonably takes twenty-four to forty-eight hours to process each release.

In *Brass,* the County provided similar information about its administrative processing system in order to defend its con-

tested policies.[1] However, in light of the different nature of the claims in the two cases, and in order to adopt the proper judicial role at summary judgment, we must adopt a different stance with regard to the information provided by the County than did the panel in *Brass*. The *Brass* panel assessed the County's detailed description of its processing system in order to determine the reasonableness of the policies themselves. It was entirely appropriate for the *Brass* panel to conclude, as a matter of law, that the County's policy of processing releases in a certain order is reasonable. It was also an appropriate judgment of law to determine that the County's policy of waiting until all of the day's wants and holds are processed is reasonable and, in fact, serves important societal interests. The *Brass* opinion reached these conclusions and did not go further, since the plaintiff in *Brass* was contesting the policies themselves, not the reasonableness of their implementation.

In contrast, the plaintiffs here contend that they were over-detained for twenty-six to twenty-nine hours because the County's policies are being implemented in a manner that is deliberately indifferent to their right to freedom from incarceration. We cannot determine whether the County's implementation of its policies is in fact reasonably efficient based solely on the defendants' self-serving declarations. This would be an improper basis for summary judgment, as the County's explanations and defenses "depend on disputed facts and inferences" that are proper for jury determination. *Blair*, 223 F.3d at 1080. Based on the County's declarations, a juror could find that its explanations reasonably justify a twenty-nine hour delay in release from jail. On the other hand, a juror could also find that the time each necessary administrative task reasonably requires simply does not add up to twenty-nine hours.

This issue was recently addressed by a district court that considered a seven and a half day over-detention in Los Angeles County jail in light of *Brass*. *See Green v. Baca*, 306 F.Supp.2d 903 (C.D.Cal.2004). The district court found that, even if it accepted the County's contention that it did not receive notice of the release order until twelve and a half hours prior to release, it would still be required to deny the motion for summary judgment. *Id.* at 918. The court stated,

> *Brass* does not hold that a 39 hour delay between issuance of a release order and actual release is reasonable as a matter of law.... Certainly, [the court] cannot determine reasonableness as a matter of law when defendant has offered only a

---

1. Drawing from the declaration of Lieutenant Sneed of the Sheriff's Department, the *Brass* panel discussed the facts underlying the County's release procedure: the County books and releases close to 600 inmates per day; many inmates are repeat and/or serious offenders; law enforcement and other government agencies frequently place holds on a particular inmate's release; holds are updated continuously, which involves sifting and inputting thousands of documents daily; and, given the paperwork involved, it generally takes twenty-four to forty-eight hours to process an inmate's release. 328 F.3d at 1199. Nearly identical descriptions of the County's release procedures are included in the ex- cerpts of record in the instant cases. The record contains declarations by both Patricia Jones, Head Custody Records Clerk at the IRC, and Charles M. Jackson, Commander of the Correction Services Division, which oversees the IRC. Both declarations include statistics—similar to those in *Brass*—about the volume of inmates the system processes each day. These declarations also provide a detailed description of the processing of wants and holds, and discuss additional administrative steps that are required prior to release (including transportation, the return of clothing and property, and medical screening).

general assertion that certain steps must be completed prior to release, and provided no explanation as to why those steps are necessary or why they take a particular period of time to complete. *Id.* (citing *Gramenos v. Jewel Cos.*, 797 F.2d 432, 436–37 (7th Cir.1986) (" 'On remand the police should explain what must be done after an arrest for shoplifting and why reasonably diligent officers need more than four hours to do it.' " (emphasis omitted))).

■ While the County in both *Brass* and the instant cases has provided some explanation of the steps necessary prior to release, its declarations offer only general assertions as to why these steps would reasonably take up to forty-eight hours. In order to determine if this length of time is, in fact, reasonable, the jury must be presented with the administrative processes, the volume of bookings and releases, as well as other considerations that affect the County's ability to process releases. It may very well be that a reasonable juror would conclude that, given the necessary administrative tasks and voluminous demands on the county, the delays at issue were justified. However, we conclude that this is a factual determination that is appropriately left to the jury to decide.

## C. *The Absence of a Per Se Rule of Reasonableness*

Courts have not settled on any concrete number of permissible hours of delay in the context of post-release detentions. In contrast, in the context of detentions pending probable cause determinations after warrantless arrests, the Supreme Court has held that jurisdictions that establish probable cause within forty-eight hours of arrest will be immune from systemic challenges. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). A delay in determining probable cause that lasts less than forty-eight hours can raise constitutional concerns only if the arrested individual can prove unreasonable delay.[2] *Id.* However, "[w]here an arrested individual does not receive a probable cause determination within 48 hours, the calculus changes. . . . [T]he burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." *Id.* at 57, 111 S.Ct. 1661.

In *Brass*, the panel discussed *McLaughlin* and concluded that, while the two contexts share the same concerns about the need for flexibility in the face of inevitable administrative and logistical delays, they may not share the same precise calculus. The final paragraph of *Brass* muses:

> It is unclear, however, whether the 48–hour period applied to probable cause determinations is appropriate for effectuating the release of prisoners whose basis for confinement has ended. One might conclude that when a court orders a prisoner released—or when, for example, a prisoner's sentence has been completed—the outer bounds for releasing the prisoner should be less than 48 hours. We need not determine that question here, however, since we have concluded that in the circumstances of this case, the 39–hour delay in releasing Brass was reasonable and did not violate his constitutional rights.

328 F.3d at 1202.

We agree with *Brass* that there are reasons to question the applicability of the forty-eight hour rule in this context. Applying *McLaughlin's* stringent proof re-

---

**2.** The Court provided as examples of unreasonable delay "delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *McLaughlin*, 500 U.S. at 56, 111 S.Ct. 1661.

quirement to post-release detentions of less than forty-eight hours would be difficult to reconcile with the fact that, for the plaintiffs at issue here, there has been a judicial determination that they are entitled to freedom from the criminal justice system. Thus, the societal interest in the processes that result in delay, while significant, may not be as weighty as in the probable cause context. *Compare McLaughlin,* 500 U.S. at 53, 111 S.Ct. 1661 ("[T]he Fourth Amendment requires every State to provide prompt determinations of probable cause . . . ."), *with Streit v. County of Los Angeles,* 236 F.3d 552, 564 (9th Cir.2001) ("Searching for wants and holds that may or may not have been issued for persons whom the state has no legal right to detain is an administrative function of jail operations for which the LASD answers to the County. Whether or not the policy and practice of detaining persons beyond their term of incarceration for this administrative function violates the Constitution will be a question for the trial court." (citations omitted)).

At the same time, the administrative burden of accelerating the release process—in particular, running a computer check on wants and holds within less than forty-eight hours—does not seem as weighty as the burden of establishing probable cause under a tight timeline. *Compare McLaughlin,* 500 U.S. at 53, 111 S.Ct. 1661 (explaining that the Court has stopped short of requiring immediate probable cause hearings because of "the burden that proliferation of pretrial proceedings places on the criminal justice system" and the fact that "the interests of everyone involved, including those persons who are arrested, might be disserved by introducing further procedural complexity into an already intricate system"), *with Fowler v. Block,* 2 F.Supp.2d 1268, 1279 (C.D.Cal.1998) (stating that "there is no reason why a check for wants and holds needs to occur after a person is released. As Plaintiff's counsel argued, those checks can occur at anytime between the original arrest and the case's ultimate disposition."), *rev'd on other grounds, Fowler v. Block,* 185 F.3d 866 (9th Cir.1999).

Adopting the forty-eight hour rule into the context of post-release detentions would also directly conflict with at least one other circuit, which has found no zone of presumptive reasonableness in this context. In *Lewis v. O'Grady,* 853 F.2d 1366 (7th Cir.1988), the Seventh Circuit considered a plaintiff's § 1983 claim against the county for his eleven hour over-detention after his court-ordered release. The panel reversed the district court's directed verdict in favor of the county. It held that, "What is a reasonable time for detaining a prisoner in custody is a question best left open for juries to answer based on the facts presented in each case. . . . It is for a jury to determine whether the 11 hours it took the sheriff to discharge Lewis was reasonable." *Id.* at 1370. The defendants in *Lewis* provided evidence regarding the administrative and logistical reasons for the delay. *Id.* (describing the busing system, which left only every five hours, and the county jail's responsibility for processing 600–800 prisoners returning from court each day). Acknowledging this evidence, the *Lewis* panel recognized that a "[r]easonable time must be allowed for such matters as transportation, identity verification, and processing." *Id.* But it found it is "virtually impossible to establish an absolute minimum time to meet all potential circumstances which might exist." *Id.* Therefore, it concluded that it was appropriate for the jury to determine whether the time taken was reasonable in light of the facts presented. *Id.*

Like *Brass* and *Lewis,* we decline to determine a number of hours that is presumptively reasonable for post-release

over-detentions. In light of the case law on both post-release over-detentions and *Monell* claims of deliberate indifference, we find no basis for holding the detentions at issue presumptively reasonable as a matter of law.

D. *Applying* Oviatt

In light of the foregoing discussion, we return to *Oviatt's* four-step framework for resolving *Monell* claims of deliberate indifference. In order to impose liability based on a policy of deliberate inaction, the plaintiff must establish that he possessed a constitutional right of which he was deprived. Here, the plaintiffs possessed a constitutional right to freedom from imprisonment a reasonable time after they were judicially determined to be innocent of the charges against them. *See Oviatt*, 954 F.2d at 1474 (stating that "[t]he Supreme Court has recognized that an individual has a liberty interest in being free from incarceration absent a criminal conviction"); *cf.* *Brass*, 328 F.3d at 1200 (recognizing that the plaintiff "may have had a due process right to be released within a reasonable time after the reason for his detention ended").

Step two of *Oviatt*—the existence of a municipal policy—is uncontested. Both parties agree that the County has a set of administrative policies that guide releases after judicial determinations of innocence. Both parties also agree on step four: these policies resulted in delays in the release of each of the plaintiffs, ranging from twenty-six to twenty-nine hours after their court-ordered release.

Step three of *Oviatt* remains: did this set of policies—or, alternatively, the lack of policies to expedite the process— amount to a policy of deliberate indifference to the plaintiffs' constitutional rights? This question turns on whether the County's implementation of its policies was rea-

sonable in light of the delay that resulted. Baca concedes that he knew that the implementation of the County's policies was resulting in delays of up to 48 hours. Therefore, if the delays were not reasonably justified, the § 1983 claim against the County has merit, because the County was continuing to adhere to a policy that it knew resulted in unlawful detentions without reasonable cause. *See Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). We find that this question of reasonableness is properly conceived of as a jury determination.

## III. *Conclusion*

In light of the foregoing discussion, we reverse the district court's grant of summary judgment to the defendants, and remand this case for further proceedings consistent with this opinion.

REVERSED AND REMANDED.